UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JAMES E. PENROD, Jr.,

Plaintiff,

Case No. 25-CV-00268

v.

ANTHONY BARRIERE,
JASON KRUEGER,
KYLE KINZER,
MATTHEW CURI,
PEP MORETTI,
ROBERT CRAWFORD,

Defendants.

**DEFENDANTS' BRIEF IN SUPPORT OF SUMMARY JUDGMENT**

Defendants, Officer Barriere, Officer Krueger, Officer Kinzer, Officer Curi, Officer Moretti, and Officer Crawford, by their attorneys, Alia, DuMez & McTernan, S.C., submit this Brief in support of their Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56(a).

Summary judgment is appropriate in this matter because Plaintiff cannot demonstrate that Officer Barriere's decision to deploy his police canine, Lupo, and apprehend Plaintiff until he was secured was unreasonable given the totality of the circumstances created by Penrod's decision to flee and evade a lawful arrest. Because there was no underlying unreasonable force, Officer Krueger, Officer Kinzer, Officer Curi, Officer Moretti, and Officer Crawford ("collectively "Bystander Officers") had no reason to intervene during Penrod's lawful arrest. Finally, Defendant officers are entitled to qualified immunity because there is no Supreme Court precedent concluding Officer

Barriere's use of Lupo to use a bite-and-hold technique to obtain a fleeing suspect until he is secured and then immediately remove Lupo is excessive force. As such, all claims against Defendants, Officer Barriere, Officer Krueger, Officer Kinzer, Officer Curi, Officer Moretti, and Officer Crawford, must be dismissed.

## STATEMENT OF FACTS

On September 15, 2023, the City of Kenosha Police Department (KPD) was called to the parking lot on the corner of 7th Avenue and Sheridan Road in Kenosha, Wisconsin to arrest Mr. James Penrod (Penrod) for an active felony probation warrant. **(Defendants' Proposed Findings of Fact (DPF) ¶ 6)**. Penrod was on probation because of a 2022 guilty plea for "domestic abuse" and bail jumping. **(DPF ¶ 3)**. Additionally, Penrod was a registered sex offender. **(DPF ¶ 4)**. Earlier that day, Penrod was informed by his probation officer that he had violated the terms and conditions of his probation and that he had a warrant for his arrest. **(DPF ¶ 5)**. After learning of his arrest warrant, Penrod "chopped" off his court ordered GPS monitoring ankle bracelet. ***Id.***

At approximately 4:43 p.m., Penrod saw a KPD squad car pull into the parking lot where he was located and knew he was going to be arrested. **(DPF ¶ 7).** In order to evade the officers and not go to jail, Penrod fled east across 7th Avenue to a heavily wooded area of Pennoyer Park on the banks of the Pike River adjacent to Kenosha's lake front. ***Id.*** Penrod purposefully hid and entrenched himself in a location that was very wooded and concealed by thick vegetation so responding officers would not be able to see him. ***Id.***

When Officer Barriere arrived on the scene, dispatch informed him that Penrod fled from the parking lot and may be hiding somewhere along the banks of the Pike River in the thick vegetation of Pennoyer Park. **(DPF ¶ 8).** Pennoyer Park is a popular public park in the City of Kenosha that has a bandshell for live music, park benches to enjoy the lakefront scenery, a

playground for young children, and is a popular fishing destination for the Kenosha community. **(DPF ¶ 11).**

Officer Barriere parked his squad car on the Pike Trail facing south and began to search for Penrod on foot using his canine partner, Lupo, on leash. **(DPF ¶ 9).** Prior to entering the brush and vegetation, Officer Barriere yelled a loud warning stating as follows:

> *Kenosha Police K-9 Unit. You in the bushes need to come out now, I am going to send this dog, and you will be bit…James, we know you're hiding you need to come out now or I'll send this dog and you will be bit.* ***Id.***

Officer Barriere lead Lupo on his leash into the brush and woods beginning on the north side of Pennoyer Park near the Kenosha Sportfishing and Conservation Salmon Pond. **(DPF ¶ 12).** After unsuccessfully searching that area for Penrod, Officer Barriere, Lupo, and now Officer Curi, left the vegetation and were walking on the grass when a citizen informed them there was a guy laying in the bushes south of their current location. **(DPF ¶ 14).** Given the updated information, Officer Barrier, Lupo, and Officer Curi ran south and again entered the bushes. ***Id.*** At this time, Officer Barriere, Lupo, and Officer Curi were at a tactical disadvantage because the dense vegetation, uneven terrain, and limited visibility provided Penrod with natural cover, concealment, and the element of surprise making them uniquely susceptible to being ambushed and violently attacked. **(DPF ¶ 13).**

While searching in the heavy vegetation, Lupo first made contact with Penrod while Penrod was still completely hidden in the bushes and in his original entrenched position. **(DPF ¶ 15).** At this time, not only was Penrod still not visible to Officer Barriere, but the locations near Penrod, where he could have accessed a weapon, also remained hidden by the vegetation. **(DPF ¶ 16)** Once Lupo made contact with Penrod, Officer Barriere commanded Penrod to show his hands and get out of the bushes. **(DPF ¶ 16 ).** Despite these directions, Penrod remained hidden and did not

surrender to the police. ***Id.*** Because Penrod refused to follow Officer Barriere's commands, Penrod remained hidden and a threat to the responding officers. ***Id.***

As Lupo was apprehending Penrod, Officer Barriere positioned himself closer to Penrod grabbed him, put Penrod's hands behind his back, and placed Penrod in handcuffs. **(DPF ¶ 16).** During this time, Penrod continued to fight and resist Lupo by forcefully kicking and moving his legs. **(DPF ¶ 17).** Once Penrod was cuffed, Officer Barriere immediately attempted to manually remove Lupo from Penrod's leg. **(DPF ¶ 18).** Because Penrod remained in his chosen hiding spot deep within the bushes, Officer Barriere needed to maneuver him out of the bushes in order to reach Lupo. ***Id.*** As Penrod was getting brought out of his concealed position, Penrod continued to fight Lupo. **(DPF ¶ 19).** Once Penrod was secure and out of the bushes, Officer Barriere immediately removed Lupo. ***Id.*** Once in custody, Penrod admitted that he knew KPD officers were searching for him and that he knew they were using a canine to apprehend him. **(DPF ¶ 10).**

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) instructs courts to grant summary judgment if there is no genuine dispute as to any material fact. There can be no genuine issue of fact where there is a complete failure of proof. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). A material fact is one that is outcome determinative of an issue with substantive law identifying which facts are material. *Anderson v. Liberty Lobby*, *Inc*. 477 U.S. 242, 248 (1986). While the initial burden is on the moving party to establish the non-existence of any genuine issue of material fact, once this burden is discharged, the burden shifts to the non-moving party who must set forth affirmative evidence and specific facts showing there is a genuine dispute on that issue. *Id.* at 249. Once the moving party has met this burden, the opposing party must go beyond the pleadings and designate the specific facts showing that there is a genuine issue. *Id.* at 248. The mere existence of some

alleged factual disputes will not defeat an otherwise properly supported motion for summary judgment. *Id*. at 242. Nor will speculation, hearsay or conclusory allegations suffice to defeat summary judgment. *Gorbitz v. Corvilla, Inc*., 196 F.3d 879, 882 (7th Cir. 1999).

Summary judgment is the "put up or shut up" moment in litigation, where "the non-moving party is required to marshal and present the court with evidence [he] contends will prove [his] case." *Goodman v. National Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). The non-moving party "must do more than simply show that there was some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Therefore, summary judgment is properly entered against a party "who fails to make a showing to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Austin v. Walgreen Co*., 885 F.3d 1085,1087-88 (7th Cir. 2018).

Under the totality of the circumstances, viewed from the perspective of a reasonable officer in Officer Barriere's position rather than with the benefit of frame by frame video analysis and 20/20 hindsight, Officer Barriere's use of a police canine to locate and apprehend Penrod was objectively reasonable and did not otherwise violate the Fourth Amendment. Additionally, this Court should find that Officer Barriere is subject to qualified immunity because there is not a clearly established law that would have put a reasonable officer on notice that he could not use a police canine to apprehend an entrenched non-compliant fleeing suspect and have a police canine use a bite-and-hold technique until the suspect was in handcuffs, secured, and out of the thick vegetation. As such, this Court should grant the Defendants' Motion for Summary Judgment and dismiss Penrod's complaint in its entirety.

## ARGUMENT

Plaintiff alleges that, although he fled from officers and concealed himself in dense vegetation to avoid arrest, he posed no immediate threat and was compliant with officer commands. (Dkt. No. 1). Those allegations are contracted by the video evidence and the undisputed circumstances confronting officers on the scene. To reach his conclusions, Plaintiff will ask this Court to engage in an impermissible second-by-second critique of split-second police decisions, divorced from the dangerous and rapidly evolving scenario caused solely by Penrod's unlawful decisions and actions.

### I. OFFICER BARRIERE'S USE OF FORCE WAS OBJECTIVELY REASONABLE.

#### A. Legal Standard Governing Fourth Amendment Excessive Force Claims.

The question of whether the use of force during an arrest is lawful under the Fourth Amendment depends on the objective reasonableness of the officer's actions, judged on the basis of the conditions the officer faced, without regard for underlying intent or motivation. *Graham v. Connor*, 490 U.S. 386, 396 (1989). In order to assess objective reasonableness, courts consider the totality of the circumstances presented to the officer which include "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Id.*; *Johnson v. Scott*, 576 F.3d 658, 660 (7th Cir. 2009); *Lawrence v. Kenosha County*, 391 F.3d 837, 843 (7th Cir. 2004). The reasonableness of force is analyzed from the perspective of a reasonable officer on the scene, rather than with the clarity of 20/20 hindsight. *Graham*, 490 U.S. at 396.

The right to make a lawful arrest inherently carries with it the right to use a certain amount of force. *Saucier v. Katz*, 533 U.S. 194, 208 (2001). As such, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. *Graham*, 490 U.S. at 396-97. The calculation of reasonableness must embody allowance for the

fact that police officers are often forced to make split-second decisions in circumstances that are tense, uncertain, dangerous, and rapidly evolving about the amount of force that is necessary to effectuate an arrest. *Id.*

### B. Officer Barriere's Decision to Deploy a Canine was Reasonable to find the Hidden Penrod.

On September 15, 2023, Officer Barriere arrived on the corner of 7th Avenue and Sheridan Road in Kenosha, Wisconsin to apprehend Penrod who was a registered sex offender wanted on a felony probation warrant. **(DPF ¶ 6)**. Officer Barriere quickly learned Penrod fled from his original position and was evading arrest. **(DPF ¶ 8)**. Below is the route Penrod took from the parking lot to his eventual entrenched hiding place in the wooded area of Pennoyer Park.




(Richer Decl. ¶ 6. Penrod Depo. p. 55-56, Exh. 5)

Penrod's chosen hiding spot is in a heavily wooded area with an uneven terrain that slopes down toward the water. **(DPF ¶ 13)** Below please find a picture of the wood line at Pennoyer Park near where Penrod was eventually found. (Barriere Decl. ¶ 3: Still image from BWC 24:46).




Deploying a police canine is reasonable in order to apprehend a fleeing suspect who conceals himself in a position where he could ambush police officers because canines have special training and skills that allow them to detect human order even if a suspect is unseen by officers.

For example, in *Becker v. Elfreich*, Officer Elfreich executed a search warrant to arrest Jaime Becker at his mother's home. *Becker*, 821 F.3d at 923. While near the doorway, Becker's mother yelled up to her son who was upstairs informing him that the police were there to arrest him. After waiting about 30 seconds and not seeing or hearing from Becker, Officer Elreich released his canine partner, Axel, into the house to find and apprehend Becker. *Id.* In that case, the Court recognized that a suspect concealing himself in an area where the suspect had a tactical advantage and could ambush officers can be a reasonable basis to deploy a police canine. *Id.* at 927.

Using Lupo to search and detain Penrod was reasonable because Penrod was a wanted sex offender violating a court order, Penrod fled from officers in order to avoid arrest, and Penrod

positioned himself in a tactically advantageous location where he could ambush and harm officers from the high ground in a concealed position. Penrod agreed. He testified as follows:

Q: So, you're not claiming that the use of the dog to find you was excessive?

A: No.

(Richer Decl. ¶ 7. Penrod Depo. p.93:12-14).

Similar to Becker hiding in a home, Penrod was in a position where he posed a threat to ambush and attack the responding officers. Penrod was convicted of third degree sexual assault in 2014 and was placed on the sex offender registry for 15 years. **(DPF ¶¶ 3,4)** Despite Penrod not appreciating the significance of his crimes (referring to his sexual assault as just a "hand job in a hallway" and not a violent act because it was not rape), a reasonable officer would consider a sex offender fleeing arrest and hiding in a City of Kenosha park where women and children are likely present without his GPS ankle monitor as a threat to the public and the searching officers. (Richer Decl. ¶ 8. Penrod Depo. p. 130-131). As such, Officer Barriere's decision to deploy and use Lupo's specialized skills and training to find and apprehend Penrod was reasonable.

**C. Penrod being bitten by Lupo was Objectively Reasonable.**

Officer Barriere deploying a police canine to apprehend Penrod by using the bite-and-hold technique was objectively reasonable under the *Graham* factors. Importantly, to overcome summary judgment, it is the plaintiff's burden to show the officer's use of force was objectively unreasonable from the perspective of an officer on the scene under the totality of the circumstances. *Hortan v. Pobjecky*, 883 F.3d 941, 949 (7th Cir. 2018). It is not the defendants' burden to demonstrate the inverse.

The first *Graham* factor under the reasonableness of force analysis is the severity of the crime at issue. When Officer Barriere arrived on scene, he was informed that Penrod had an active

felony probation warrant and that he was a registered sex offender. **(DPF ¶ 6)**. Penrod violated the probation of his underlying charge of domestic battery, or as Penrod described it, domestic abuse, and bail jumping. **(DPF ¶ 5).** According to Wisconsin Statute Section 940.19, an individual has committed a battery if they cause "bodily harm to another by an act done with intent to cause bodily harm to that person or another without the consent of the person so harmed…" A registered sex offender convicted of domestic battery without his GPS ankle monitor can reasonably be considered dangerous and willing to use force, disobey the police, and pose a risk to anyone at Pennoyer Park. *See e.g.*, *Baird v. Renbarger*, 576 F.3d 340, 344 (7th Cir. 2009) ("crimes that contain the use of force an element" are serious crimes for purposes of analyzing the Graham factors along with drug crimes because they are "associated with violence."); *Henning v. Milone*, 2021 WL 5412336, at *1-2 (7th Cir. Nov. 19, 2021) ("Given that the underlying crime (reckless driving) was serious, [the defendant officer] had reason to believe that [the plaintiff] might be armed . . ."). As such, because Penrod harmed others, disregarded court orders, and was willing to ignore officer commands, Officer Barriere and the other responding officers could reasonably expect that Penrod would take extreme and violent measures to avoid arrest from his concealed and entrenched position. No reasonable factfinder could conclude otherwise.

The second *Graham* factor under the reasonableness of force analysis is the immediate danger posed by Penrod to Officer Barriere and the other officers. As discussed above, Officer Barriere and the other officers reasonably believed that Penrod was a threat to resist being taken into custody because he fled and was hiding from the police. Compliant suspects do not flee and hide in the bushes. Rather than engage with officers in the open parking lot on 7th Avenue. Penrod fled the scene because, he did "not want to go to jail." **(DPF ¶ 7).** Suspects that do not want to go to jail harm officers. Instead of surrendering himself to the KPD, Penrod chose to hide in a public

park in a heavily wooded area where he could not be seen. Below (top) is the location where Penrod hide and entrenched himself from the police and the dense vegetation experienced by Officer Barriere and Lupo while searching for Penrod (bottom).




(Barriere Decl. ¶ 3: BWC screenshot at 24:45).




(Barriere Decl. ¶ 3: BWC screenshot at 25:05).

Yelling at the dog to stop is not compliance. Talking is not compliance. Saying "okay" is not compliance. Standing up, leaving the bushes, and surrender to the officers is compliance. Until Penrod was secured and placed in handcuffs, he had a tactical advantage due to environmental factors over the officers and remained a serious threat. As such, Officer Barriere and the responding officers reasonably believed that Penrod posed a danger to them as a potentially armed suspect who was seeking to avoid a lawful arrest by hiding in the bushes where he could not easily be seen or accessed making them susceptible to a deadly ambush.

The third and final *Graham* factor concerns whether Penrod was resisting arrest or attempting to evade arrest by flight. Penrod fled from the parking lot at 7th Avenue into the bushes and vegetation of Pennoyer Park. Once hidden and entrenched in the wood line, multiple officers yelled and directed Penrod to surrender. Penrod testified that his intent was to hide in a place he could not be seen in order to evade arrest so he would not go to jail**.** Officer Barriere gave a verbal warning prior to searching for Penrod with his police dog, Lupo**. (DPF ¶ 9).** After his arrest, Penrod told officers he knew they were looking for him and that a police canine was searching for him. **(DPF ¶ 10).** Without question, Penrod fled and attempted to evade arrest and, likely would have been successful, but for the reasonable and necessary decision to deploy Lupo.

Due solely to Penrod's own conduct, KPD officers were confronted with a dangerous, rapidly evolving, and highly unpredictable situation. After fleeing from law enforcement and concealing himself within thick vegetation, Penrod created a significant tactical disadvantage for the officers, who were forced to search for a hidden suspect with limited visibility and an ever present risk of ambush or sudden attack. Until Penrod was located, secured in handcuffs, and the surrounding area was cleared, the threat to officer safety remained immediate and substantial. Under the totality of these circumstances, it was objectively reasonable for Officer Barriere to

deploy Lupo to locate, apprehend, and use a bite-and-hold technique to allow the KPD to take Penrod into custody.

**D. The Length of the Dog Bite was Reasonable.**

Penrod did not surrender to the officers. (Dkt. 1, p. 4-5). Communication while still hidden does not equate to physical compliance. An officer is not required to assume a suspect is secure merle because he is speaking while he still retains the ability to resist or attack. Additionally, Penrod believes that he was bit by Lupo despite his hands being visible to Officer Barriere, Penrod testified that that his hands were visible to Officer Barriere at the below point shown on Officer Barriere's body camera footage and then not visible again one second later.




(Richer Decl. ¶ 9. Penrod Depo. p.101:12-17) (Penrod testifying his hands are visible to Officer Barriere at 25:14 on Barriere BWC)



(Richer Decl. ¶ 9. Penrod Depo. p.101:18-22) (Penrod testifying his hands are not visible to Officer Barriere at 25:15 on Barriere BWC).

Officer Barriere directed Penrod to “show me your hands” and “get out of the bushes.” **(Barriere Decl. ¶ 16**). Penrod did neither. Penrod admitted that after he yelled “ok, ok, ok” his hands and the space next to where he was laying were not visible to Officer Barriere. (Richer Decl. ¶ 9). Officer Barriere could only ensure that Penrod was surrendering, rather than still attempting to attack or ambush officers, once he was close enough to put his hands on Penrod. Once secured in handcuffs, Officer Barriere immediately attempted to release Lupo from the bite. Because Penrod was still laying in the vegetation, Penrod’s legs, and Lupo on Penrod’s leg, remained deep in the vegetation. As such, Officer Barriere needed help to move Penrod into the open before removing Lupo. **(DPF ¶ 18).** Simply put, Penrod’s conduct alone was responsible for him being bitten and the length of the bite**.** Penrod chose to flee. Penrod chose to hide and conceal himself in thick vegetation. Penrod chose not to listen to commands.

For instance, in *Johnson v. Scott*, a suspect fled police by car and then later on foot. *Johnson*, 576 F.3d at 659. As a police officer and his canine got closer to him during the foot chase, the plaintiff made a last second surrender holding his hands in the air saying, "I give up." *Id.* The officer and his canine were only six to eight feet behind the plaintiff when he surrendered, and the canine grabbed the plaintiff's arm and knocked him to the ground. *Id*. at 660. After the officer was able to handcuff the plaintiff, he ordered the canine to release and the canine complied. *Id*. The Court affirmed the district court's grant of summary judgment, concluding that the officer's use of the canine and other force to complete the arrest were objectively reasonable as a matter of law. *Id*.

In *Johnson*, the Seventh Circuit observed: "[n]ot all surrenders . . . are genuine, and the police are entitled to err on the side of caution when faced with an uncertain or threatening situation." 576 F.3d at 600 (noting that Johnson's surrender did not establish that he was unarmed in concluding that the use of the police dog was reasonable throughout the arrest); see also *Crenshaw v. Lister*, 556 F.3d 1283, 1293 (11th Cir. 2009) (reasoning that the defendant officer did not use excessive force in not calling off police dog until after he ensured that the plaintiff was fully secured, "regardless of whether [the plaintiff] was actively resisting at that point, as [the officer] had no reason to trust that [the plaintiff] would not suddenly attempt to do him harm."); *Esparza v. Wolf*, No. 16 C 6016, 2019 WL 1773351, at *3 (N.D. Ill. April 4, 2019) holding that notwithstanding the plaintiff's subjective intent, "the objective circumstances observable by [the defendant officer] would not have led a reasonable officer to believe that Esparaza had surrendered."): *Ingram v. Pavlak*, No. Civ. 03 – 2531 (RHK/AJB), 2004 WL 1242761, at *5 (D. Minn. June 1, 2004) (holding that officers reasonably could send a dog into a closet to flush out a

suspect because, although the suspect said he was surrendering, he continued to hide in the closet, and the officers could not predict what he might do.)

Penrod remained a threat to officer safety until Officer Barriere secured him in handcuffs. While hidden, the responding officers had no reason to trust Penrod would "flip the switch" and become compliant. Until Officer Barriere had hands on Penrod, was concealed in dense vegetation, with his hands and the area immediately surrounding him obscured from view, leaving officers unable to determine whether he was armed, preparing to resist, or positioned to ambush. Once Penrod was handcuffed, Officer Barriere immediately moved to reposition him and release Lupo.

## II. OFFICER BARRIERE IS ENTITLED TO QUALIFIED IMMUNITY.

Under the doctrine of qualified immunity, police officers are shielded from suit for damages if "a reasonable officer could have believed [the action taken was] lawful, in light of clearly established law and the information the officers possessed." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). Although intertwined with the facts of a case, the qualified immunity issues is a question of law for the court. *Alvarando v. Picur*, 859, F.2d 488, 451 (7th Cir. 1988). Therefore, the threshold question of qualified immunity is properly resolved on summary judgment because its analysis is primarily objective. *See Rakovich v. Wade*, 850 F.2d 1180, 1203-04 (7th Cir. 1988).

"To strike a balance between addressing constitutional injuries committed by state actors and limiting the costs of section 1983 suits, the Supreme Court has held that the common-law doctrine of 'qualified immunity' applies in most cases against executive officials, including the police." *Harlow v. Fitzgerald*, 457 U.S. 800, 816 (1982). "Because of the importance of qualified immunity to society as a whole, the [Supreme] Court often corrects lower courts when they wrongly subject individual officers to liability." *City & Cty. Of San Francisco, California v. Sheehan,* 575 U.S. 600, 611 (2015).

Governmental immunity is especially important for law enforcement officers who are frequently forced to make life and death decisions within a matter of seconds. Instances that seem calm can turn deadly. In law enforcement, a one second decision or one false assumption can be the difference between a calm arrest, or the officer not going home to see his wife and children.

> Judges view facts from afar, long after the gunsmoke cleared, and might take months or longer to decide cases that forced police officers to make split-second decision in life-or-death situations with limited information. We as judges have minutes, hours, days, weeks, even months to analyze, scrutinize and ponder whether an officer's actions were "reasonable," whereas an officer in the line of duty all too frequently has only that split-second to make the crucial decision. The events here unfolded in heart-pounding real time, with lives on the line. *Pobjecky* lacked our luxury of pausing, rewinding, and playing the videos over and over.

*Horton*, 883 F.3d at 950 (internal quotation marks and citations omitted).

While qualified immunity is an affirmative defense, once raised, the burden shifts to the plaintiff to defeat it. *Leiser v. Kloth*, 933 F.3d 696, 701 (7th Cir. 2019). "Once an officer asserts qualified immunity, a plaintiff can proceed with his case only if he can show (1) that the facts, taken in the light most favorable to [him], make out a violation of a constitutional right, and (2) that right was clearly established at the time of the alleged violation." *Koh v. Ustich*, 933 F.3d 836, 844 (7th Cir. 2019) (quotation omitted). "'If either inquired is answered in the negative, the defendant official' is protected by qualified immunity." *Est. of Davis v. Ortiz*, 987 F.3d 635, 639 (7th Cir. 2021)(stating that if the plaintiff cannot satisfy both qualified immunity prongs, then "the motion for summary judgment must be granted").

First, as detailed above, Officer Barriere deploying Lupo and then Lupo using the bite-and -hold technique to apprehend Penrod was not unreasonable and within the bounds of the Fourth Amendment. As such, Plaintiff fails the first prong in their burden to overcome qualified immunity.

Second, Plaintiff cannot demonstrate that Officer Barriere's conduct violated a right that was "clearly established" at the time and under the circumstances presented. For a right to be

clearly established, relevant case law must have previously been developed in such a concrete and factually defined manner so as to make it obvious to all reasonable public officials presented with the same circumstances as the defendant that a particular course of conduction would be unconstitutional. *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam). The Supreme Court has repeatedly advised courts "not to define clearly established law at a high level of generality." *Kisela v. Hughes*, 584 U.S 100, 104 (2018).

Thus, "while the right to be free from excessive force is clearly established in a general sense, the right to be free from the degree of force employed in a particular situation may not have been clear to a reasonable officer at the scene." *Becker*, 821 F.3d at 928. "If officers of reasonable competence could disagree on [whether or not an action was constitutional], immunity should be recognized." *Estate of Rudy Escovedo v. Martin*, 702 F.3d 388, 404 (7th Cir. 2012). Therefore, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.

Plaintiff cannot establish that every reasonable officer in Officer Barriere's place would have known that he was violating the Fourth Amendment by using a trained police dog to assist in locating and apprehending a fleeing suspect that entrenched himself in a covered and concealed position in the thick vegetation of a public park. There is no Supreme Court precedent directly on point and immunity should be recognized by this Court.

## III. PLAINTIFF'S REQUEST TO TERMINATE OFFICER BARRIERE AND COMPELL TRAINING ARE NOT COGNIZABLE RELIEFS UNDER 42 U.S.C. § 1983, AND NO EVIDENCE EXISTS FOR PUNITIVE DAMAGES.

### A. Plaintiff's Request for an Order demanding for Officer Barriere's Termination and Additional Training are not Cognizable Requests for Relief.

Plaintiff's Complaint requests "an order compelling the Kenosha Police Department to terminate the employment of Officer Barriere," and "an order compelling the Kenosha Police Department to provide the Bystander Defendants with training on their duty to intervene when another officer is using excessive and unreasonable force." (Dkt. No. 1, p. 10). This request should be dismissed as a matter of law because 42 U.S.C. § 1983 does not create a private right for a plaintiff to compel a municipality to terminate, discipline, or otherwise control the employment status of police officers.

The Supreme Cout has made clear that municipal liability under § 1983 is limited to constitutional violations not merely because a municipality employs an individual alleged to have committed a wrong doing. *Monell v. Dep't of Soc Servs.*, 436 U.S. 658, 691-94 (1978). Additionally, the Supreme Court has strictly limited the availability of equitable relief in civil rights actions to circumstances involving a real and immediate threat of future injury, rather than punishing past conduct. *City of Los Angeles v. Lyons*, 461, U.S. 95, 101-06 (1983).

Penrod requests that his § 1983 claim become a vehicle for employment discipline rather than constitutional redress. Employment decisions and training of officers is at the discretion of the municipality and its departments under Wisconsin law. Federal courts do not have the authority to oversee these decisions in the absence of a legally recognized employment claim. See generally *Rizzo v. Goode*, 423 U.S. 362, 379 (1976); *O'Shea v. Littleton*, 414 U.S. 488 (1974)(holding that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief.") Additionally, no facts exist that Penrod has any genuine threat for future injury.

As such, Penrod's requests to terminate Officer Barriere and train the "Bystander Officers" should be denied.

**B. No evidence Exists to Claim Punitive Damages.**

In addition to injunctive relief, Plaintiff seeks monetary relief in the form of punitive damages. (Dkt. No. 1, p. 10). Plaintiff's demand for punitive damages against the Defendant police officers fails because there are no facts that establish any of the responding Defendants acted with evil motive or intent, or with reckless or callous indifference. *Smith v. Wade*, 461, U.S. 30, 56 (1983*); Kyle v. Patterson*, 196 F.3d 695, 697-98 (7th Cir. 1999). Allegations of negligence, mistake, or even a constitutional violation alone are not enough to support a punitive damages claim. Because Penrod alleges no facts that plausibly suggest malicious intent or reckless indifference, the request for punitive damages should be dismissed.

## CONCLUSION

Officer Barriere acted reasonably when he deployed his police canine to find Penrod after he fled from officers and hid in the thick vegetation of Pennoyer Park. Additionally, Officer Barriere acted reasonably when he deployed Lupo to conduct a bite-and-hold technique on Penrod until Penrod was no longer a threat and completely secured in handcuffs. Accordingly, Defendants respectfully request that the Court grant their Motion for Summary Judgment and award them all other relief that is just and appropriate.

Dated at Kenosha, Wisconsin this 30th day of April 2026.

**ALIA, DUMEZ & MCTERNAN, S.C.**
Attorneys for Defendants, Anthony Barriere, Jason Krueger, Kyle Kinzer, Matthew Curi, Pep Moretti, and Robert Crawford

By: /s/ *Matthew J. Richer*
Matthew J. Richer
State Bar No. 1097557

6633 Green Bay Road
Kenosha, WI 53142
O: (262) 654-8700
F: (2620 654-8600
E: mjr@addmlaw.com